I will start with 21-1196, and I will just say Campania v. Grupo. Would counsel for appellant make your appearance and proceed? Thank you, Your Honor. May it please the Court, David Cooper on behalf of the Appellant's GCC. And I'd like to reserve two minutes for rebuttal. The facts here are somewhat complicated, but the relevant facts are relatively simple and largely undisputed. A few weeks after this Court affirmed a judgment confirming a Bolivian arbitration award, the highest court in Bolivia set aside the damages portion of that award as void under Bolivian law. The only question is whether GCC should be forced to pay an award that now amounts to almost $50 million, despite the fact that the court where the arbitration took place, applying the law that the parties chose, held that the arbitration award was void under the law of Bolivia. This result would defy established principles of comedy, the New York Convention, a Second Circuit case directly on point, and common sense, which all recognize the unfairness and absurdity of requiring payment for an award that no longer exists. First, I'd like to start with the legal standard here, and the standard that courts have consistently applied when determining whether to give respect to a foreign court order vacating a foreign arbitration award is whether that foreign court order is repugnant to fundamental notions of justice. So is the focus of the repugnancy inquiry on the order itself or its enforcement in the secondary jurisdiction? It's the first, and every single court that I have seen that Simpson has cited have all interpreted it the same way. It's whether the order itself, the foreign court order, is repugnant to fundamental notions of justice.  You have, for example, the Pemex case is sort of the prototypical example, where you have an entity, a governmental entity, that creates retroactive legislation to effectively immunize itself after the fact, and they said that's repugnant to fundamental notions of justice. So you're looking at the foreign court order. And the district court did look at the foreign court order, and what it said was it is not repugnant to fundamental notions of justice. Well, counsel, didn't the Second Circuit in Tlailao also say that notions of justice showing had been made that vacatur will offend basic notions of justice? That suggests that the repugnant standard also concerns whether vacating the order here would offend notions of justice. So I think that there's a little bit of conflation there between two different issues. I think there's one issue is, is the foreign court order repugnant to fundamental notions of justice? And then there is a second issue, which the Tlailao Court recognized, which is even if it's not, there might be equities that could overcome what even they said was the great presumption we would put in favor of the foreign court order. Why isn't it reasonable to read that opinion as applying the repugnant standard to both? In other words, you look at the Bolivian orders, you look at what would happen if there was a vacatur of the confirmation order, and you measure the totality against notions of justice. Isn't that a reasonable reading of what the Second Circuit did? I mean, I've read it a number of times, and there are a lot of clues along the way pointing in those directions. Well, I'd say two things. First, if we look more broadly at the cases that have applied this repugnance test, which is a test. Well, that's fine. Tell me about Tlailao first. Sure. So what I would say about Tlailao is even if this Court interprets it in that way, it wouldn't affect the results here. Because Tlailao, if the question is, as the Tlailao Court recognized, can you overcome that great presumption in favor of foreign court orders, and let's apply a repugnance test to do that, assuming that's the test. That test clearly is not overcome here, and I'd be happy to walk through the specific reasons the district court gave, which clearly don't overcome that test. In fact, don't weigh at all in the analysis. And the first and the principal reason the district court gave. Before you get to your first reason, in terms of not weighing into the analysis, is it your position that finality is not at all part of the public policy considerations under the New York Convention and the relevant cases? So I think finality could be in a different case. That is, we can posit a case where 20 years later a foreign court comes in and says, hey, actually I think this award should be vacated for various reasons, and we'd say, there's a finality interest there. But the district court's, the finality interest it gave, was not the finality in the U.S. court judgment. The district court couldn't do that, because of course it had only been a few weeks after this court issued its decision. So what the district court said was, I'm going to look at the finality interest of the Bolivian court judgment, which I believed was correct in 2016, as opposed to the Bolivian court judgment that came later in 2020. And that was a fundamental error in two respects. First, the court assumed that the Bolivian court order in 2016 was final, and it unquestionably was not. Every party in the G.C. SIMSA, GCC, the district court, this court in its prior opinion in this case, all recognized that there were pending proceedings on the damages award, that it was not final. Yes, but unquestionably, I thought there was expert testimony that it was final. There was expert testimony after the fact, but I can point this court to the docket entry where SIMSA, in fact, admitted, admitted that it was not a final, that it was not a final judgment. Well, the final, final can have a number of meanings. One, was there additional stuff that was going to take place? Two, would it have res judicata effect? And it was my understanding that they said that the 2016, I guess, PCT, PCT order did have res judicata effect. They claim that it has res judicata effect, but they don't disagree with a few things. First, that it was correctly decided by the 2020 PCT that it was not res judicata under Bolivian law. That is, they say it was res judicata under U.S. law. But there's no basis to import U.S. law into Bolivian proceedings. Second, under U.S. law, it's clearly not res judicata because it's in the same case. When you have a prior decision in the same case where court decides something, it gets remanded, it goes back up, there is a question of law of the case, whereas typically the higher court would respect that. But law of the case is a discretionary doctrine that, of U.S. courts, and to say that if the Bolivian courts don't follow perfectly U.S. law, the law of the case, that's repugnant to fundamental notions of justice, we would frankly say it's absurd, especially given that the parties chose Bolivian law. The parties chose Bolivian law, knew it would be reviewed by Bolivian courts. The Bolivian courts have said, they looked at this. The Bolivian courts decided for themselves. They weren't fooled. They knew there was a 2016 decision, and what they said was, well, actually, they're conflicting 2016 decisions. SIMSA created this conflict by doing two imparos at the same time, which they were not supposed to do, and looking at that conflict, we are going to say that what they did was improper and that the damages award should be annulled. And now there is a final order in the Bolivian courts. There are no more proceedings in the Bolivian courts. The only thing left to do is if they choose to file a new arbitration to get a new damages award. But the key point here is that the district court erred as a matter of law first in saying that there was a final judgment in Bolivia, which there clearly was not, second in looking at the finality interest of the Bolivian courts, which the Bolivian courts are entitled to look at and did look at and conclude that it was correct to vacate in this circumstance. Could I just ask a finality question? And I think you touched on this. This is the three weeks after the mandate issued from this court argument. Yes. Could you address, it seems like the counter to that has been that GCC waited until after the district court's confirmation of the damages award to initiate a new challenge in the Bolivian courts. Could you address that argument? Sure. I think there are two points there. The first is, again, that is a matter for the Bolivian courts to decide. So they claim that we waited approximately two and a half years in Bolivian courts to issue, to do this, what they call a queja, where we sort of go over the head of the trial judge. The reason why we did was the trial judge already had annulment arguments before him or her, and therefore we were waiting for those to be resolved. And our position had always been that the merits award was already vacated. Now when the district court said, we disagree, we don't think the merits award was vacated, then within a month, in Bolivia, we then issued that queja and said, no, okay, put that aside. We still think that this should be vacated based on the November 2016 decision. So and the Bolivian courts, again, looked at this. They made these arguments before the Bolivian courts. The Bolivian courts said that was not improper to wait, especially because there were pending proceedings at that time. And frankly, this whole mess was created by Simpson issued to Amparo's in the first place. So again, this all goes under the same rubric of we're looking at the finality and we're looking at the timing of Bolivian proceedings when that's for the Bolivian courts to decide. But I thought that Judge Matheson's question went in part to the timing of U.S. proceedings. The fact that there was a confirmation of the order. The fact that, in fact, it went up on appeal and we rendered a decision. And if I have the timing correct, it was only after we rendered a decision that further action was taken in the Bolivian courts. That's not right? Yeah, let me correct you on that, because it was actually immediately after the district court issued its decision. And I have the timing here just to make sure it's clear for the court. The queja came in May of 2019. That was one month after the district court entered its judgment in April of 2019. This court issued its mandate of October of 2020. So we didn't wait for this court to rule. Okay. And the arguments that were raised in the queja, would they have had any relevance at all to the appeal that was taking place in our court? So they wouldn't have had direct relevance to the—in the appeal, one of the things we argued is you can't confirm the award because the damages proceedings are ongoing. And there was no dispute that the damages proceedings were ongoing. And what the question was, well, can you confirm it anyway? And the district court in this court said, we understand there are proceedings that are pending, but we can still confirm it. So to that extent, it was relevant, but it wasn't on the merits relevant to the kind of issue. I mean, that was the only issue in terms of the damages award that was before the court on the first appeal. Okay. We'll see about the rebuttal time. You're out of time, though. I understand. All right. Thank you, Your Honor. Good morning, Your Honor. May it please the Court, Elliot Lauer for Simpson. Let me first address the standard for today. Relief from a final judgment is an extraordinary remedy. Denial of a Rule 60B motion is reviewed for an abuse of discretion. The court will reverse only if it finds a complete absence of a reasonable basis. The court held in—taught in Plotner that the district court has substantial discretion in a 60B motion. Here, the district court carefully reviewed the Bolivian 2020 orders against the competing interests of preserving the finality of a U.S. district court judgment that was affirmed by the circuit and for which cert was denied. This appeal does not involve a motion to confirm an award and an argument that the award should not be confirmed because of a primary jurisdiction annulment on the issue of comity. Even in such a one-dimensional case, the district court has discretion to determine whether affording comity would be repugnant to fundamental principles of American policy. But in a 60B-5 context, there are two additional considerations, finality and equity. And I understood opposing counsel to say that the lens on the finality issue was—the district court's lens was an improper one. In other words, it was focusing on, in fact, the finality of the proceedings in our court and—or in the federal system vis-à-vis the Bolivian system and the fact that the Bolivians said it wasn't final. Right. And I think my colleague is mistaken because the Second Circuit went out of its way in Tylel. It was easy enough for the Second Circuit to affirm the district court vacator of its own judgment in the exercise of discretion. But the Second Circuit, in the context of the 60B, went out of its way to say, when you're dealing with a 60B-5 motion based on an annulled arbitral award, the court must not treat the annulment as dispositive, should consider all the 60B-5 considerations, and most significantly, include the weighty interest served by protecting the finality of judgment of our courts. Now, Tylel is consistent with PEMEX, which is the other case that's really on point. The comedy cases are really not our type of case. In PEMEX, there was nothing repugnant about Mexico establishing a statute that limited the scope of jurisdiction. What was repugnant was applying it retroactively to overturn a U.S. judgment. That's exactly what happened here. We had a PCT 1481-2016 order, a judgment, a sentencia, which everyone acknowledges, including the PCT itself, is entitled to res judicata effect. And in 2020, four years later, we have an order of the PCT effectively saying, oh, we're kidding. It's not really final. We're invalidating it. So can I jump in there and get your help on the repugnance justice standard? If I'm understanding Khamenei's argument, it's that the district court used the wrong legal standard. That is, that the repugnant standard would have to do with the Bolivian 2020 orders. And if I understand your argument, the repugnant standard would go to whether it's repugnant to vacate or denied vacate, in other words, the Rule 60b-5 ruling. So far, so good? Yes, Your Honor. But may I add that there are alternative grounds. In other words, both the district court and its well-reasoned decision and the ample record in this case demonstrates the intrinsic repugnancy of the 2020 orders. But you don't need to reach that, because it would be repugnant to take those 2020 orders, which effectively ignore federated, ignore the concept of finality, and use that to jettison and vacate a district court judgment. But turning to the intrinsic issue. I would say then, would you agree then that it's a fair reading or an accurate reading of Thai-Lao that the Second Circuit would have taken both of those repugnance orders into account? In other words, there was the Malaysian order, and then we had the district court vacation decision, and both of those would be relevant to the fairness. Yes, exactly. Because if you look at Thai-Lao, Thai-Lao was a simple case. There was no Malaysian judgment when the district court ruled. There was only one judgment in Malaysia. The lateness was excused by the Malaysian court because of inaccurate advice of counsel, and the arbitration was annulled on a classic ground, lack of jurisdiction. Second Circuit goes out of its way to say, hey, this is 60B5. You've got to consider the impact on our judgment, not just whether the Malaysian judgment itself is repugnant. Now, what happened in this case? In this case, you had 1481, 2016, and the court holds there's no conflict between the two imparos, and that's a final order, and the order was final. That's a final judgment entitled to res judicata. The only thing that was left in the case at the time the district court was asked to confirm the award or there was a motion to stay confirmation was the ministerial order that the Twelfth Circuit, the Twelfth Judge refused to make simply following the mandate of the PCC. How do we interpret finality, though, in a context in which 2020 PCT says no, not final? I mean, what do we do with that? I mean, if we're supposed to view finality through the lens of the Bolivian system, help me. I mean, what do we do with that? Well, I think that's why it's repugnant. In other words, with all due respect to the Bolivian system, you have a system in which the constitutional court, it says, and the experts acknowledge the PCT sentencia is entitled to finality, and yet in the same case, we're not dealing with stare decisis, we're not dealing with changing the law. In the same case, four years later, they basically say, we don't agree with finality, and on that basis alone, the district court acted reasonably in saying, I'm not going to jettison the judgment of this court. Let me deal with the chaos, because there's a real manipulation here, and this is an equitable relief, and the district court found that they lacked equitable relief. Between the clarification ruling in January of 2017, holding that there was no conflict between the two imperos, and between the PCT decision of December 2016, and the dismissal of the tribunal impero in November of 2016, between January 2017 and March of 2019, when the district court order was entered, more than two years, they did not bring the CAHA. Now, according to Grupo, the CAHA was necessary to demonstrate that the parallel proceeding, the impero against the 12th judge, was inconsistent with and violated the tribunal order of November 2016, and all this time, you had these parallel proceedings, and they did not bring the CAHA, so when the district court was asked to confirm the award, and Grupo asked the district judge to stay proceedings, there was no reference to any concept of a CAHA, and no suggestion that there was a card that they had in their pocket that they could use to invalidate Sentencia 1481, which everyone acknowledged at that point was a final decision of the court. So turning also to other grounds for equitable relief, the district court basically found you had five years of ceaseless litigation, including in Bolivia, litigation of such acknowledged meritless litigation, acknowledged by the PCT, challenging the constitutionality of the Arbitration Act, challenging service of notice to Grupo of the dismissal of the challenge, so on and so forth. On the equitable front, and in the context of this kind of litigation, what significance should we attach to their agreement initially going into arbitration, both parties' mutual agreement, that they would not seek to attack? I mean, is that just something that you just don't consider to be worth anything, or how important is that? I think in the context where the litigant has the burden of showing entitlement to equity, a complete disregard for the rules of the arbitral tribunal and a disregard of a contract which says the arbitration will be final clearly must be taken into account. Whether by itself is dispositive, I can't say, but clearly adding that to the gamesmanship and the manipulation of not using the KO prior to the district court confirmation, that those practices clearly disentitle them to equitable relief. The order should be affirmed. Thank you for your argument. One minute rebuttal. Thank you, Your Honor. And I think the key point here is not to lose sight of what's actually going on here. If this order is affirmed, what it means is that GCC has to pay almost $50 million for an arbitration award that the Bolivian highest court says is void as a matter of Bolivian law, the law that the parties chose. And the question is whether we should say, we're going to disregard the highest court of a foreign nation because a judge in this country did not like the way in which we litigated this case, didn't like the way we litigated in Bolivia, didn't like the way we litigated in the United States. Even though there's no evidence, none of anything that was, as my opposing counsel suggests, gamesmanship or improper or meritless, the only thing that they say that we did that was supposedly wrong was waiting two years to file the CA on the Bolivian courts. But the reality is that everyone knew that there were ongoing proceedings in the Bolivian court. We asked for a stay from the district court to let the Bolivian courts conclude. The fact that we added one additional argument made one additional appeal in the Bolivian courts and waited two years to do it, and the Bolivian courts thought that was okay, is not a basis as a matter of equity to say that we should be punished to the tune of $50 million to pay an arbitration award that no longer exists. Thank you, counsel. The case is submitted.